Filed 2/26/21  P. v. Havellana CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D077137 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN385075) |
| STEVEN SCOTTY HAVELLANA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Matthew Mulford, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Steven Scotty Havellana of 19 sex offense counts, all committed against his two nieces, and the trial court sentenced him to 195 years to life in prison.  On appeal, Havellana contends (1) his pretrial

motion to suppress was erroneously denied and he was prejudiced by the admission at trial of statements he made to police; (2) three counts of sodomy are not supported by sufficient evidence of penetration; and (3) his sentence amounts to cruel and unusual punishment or an abuse of the trial court's discretion because it is more time than he can serve in a lifetime. We reject each of Havellana's contentions and affirm the judgment.

FACTS

A. *Information*

A second amended information charged Havellana with three counts of sodomy with E. (Pen. Code, § 288.7, subd. (a); counts 1-3),[1] three counts of forcible lewd act on a child, E. (§ 288, sub. (b)(1); counts 4-6), three counts of lewd act on a child, E. (§ 288, subd. (a); counts 7-9), four counts of oral copulation on a child 10 years or younger, J. (§ 288.7, subd. (b); counts 10-13), attempted sexual intercourse with a child aged 10 or younger, J. (§ 288.7, subd. (a), 664; counts 14-15), and four counts of lewd act on a child, J. (§ 288, subd. (a); counts 16-19). With respect to the forcible lewd act and lewd act charges (counts 4-9 and 16-19), it was further alleged that Havellana has been convicted in the present case of committing a sex offense against more than one victim (§ 667.61, subds. (b), (c), (e) [penalty of 15 years to life]), the crimes were committed against more than one victim (§ 1203.066, subd. (a)(7) [ineligibility for probation]), and he had substantial sexual conduct with victims under 14 years of age (§ 1203.066, subd. (a)(8) [ineligibility for probation]).

---

1    Statutory citations are to the Penal Code unless otherwise specified.

B. *Trial*

    1. *Mother*

Mother testified her daughters are J., born in June 2002, and E., born in June 2004. She also has two sons, older than the girls. Mother's older sister (Aunt) had three sons with her first husband; her third son was close in age to J. Aunt divorced her first husband and in 2004 married Havellana.

Mother lived within a three-minute walk from Aunt and Havellana, and their children spent lots of time at both houses, including having frequent sleepovers. Mother testified that she worked nights so she could be with her children during the day, and when she worked nights her children would stay at Aunt's. Aunt was like a second mother to Mother's children. Aunt and Havellana divorced in 2014.

In 2017, E. disclosed to Mother that she had been molested by her "Uncle Scotty" and her cousin A. (Aunt's son and Havellana's stepson). E. did not want anyone else to know about the abuse but agreed to talk to a counselor. Shortly after, J. disclosed to Mother that she knew what E. was going through because it happened to her too. J. was crying hysterically when she told Mother, and then J. threw up.

    2. *E.*

E., now age 15, testified her "Uncle Scotty" began touching her inappropriately when she was around seven years old. It happened so often over the years that "it was normal," she "kind of just assumed every time" she went to Aunt's house "that was going to happen."

At Aunt's house, E. typically slept on the couch, wearing a nightgown and underwear. Havellana would wake her while she was sleeping, and would sometimes "flip[]" her onto her stomach, and would "kind of like hover[]" over her, without fully putting his weight on her, but enough of his

3

weight that she, as "a weak little girl," could not get up. She testified he would touch her vagina with his hands. He would put his penis on her "butt." Sometimes he would put his penis in her "butt" and move it "like up and down." When asked to clarify, she agreed that, by "butt," she meant "the opening, the anus in [her] bottom, is . . . where he put it." She recalled having pain, both in her anus, but also in her back from his weight on her. She testified this happened "a lot" when she slept on the couch, but also once or twice when she was sleeping in Aunt's bedroom—"he put his penis in [her] anus."

E. testified Havellana never said anything to her while it was happening, and she would be quiet because she thought if he did not know she was awake, "it ma[d]e it a little better . . . because [she] just didn't want him to know." The next day, he would act "like nothing happened." She never talked about it and worried that if she did she might get in trouble. E. testified the sexual abuse happened consistently from when she was seven to 10 years old.

E. testified that she thought Havellana treated her and J. better than the other kids: he "would give [them] an extra cookie or something," but she felt he "kind of favored [her] sister."

E. testified that, at the same time these things were happening with her uncle, her cousin—who was older than her, but "not a grownup"—also touched her inappropriately; these things happened in the same time frame, but never at the same time. The incidents always occurred "one-on-one."

E. testified that it was difficult to talk about these things, she never wanted to discuss them, and she tried hard not to think about them.

E. did not understand what Havellana was doing to her until she had a sex education class in fifth grade. She was scared other people would know

4

what happened to her.  She did not know that similar things were happening to J. until much later—soon before she disclosed the abuse to her mother—even though she and J. were "best friend[s]" who told each other "everything."

   3. *J.*

  J., now age 17, testified that she, her younger sister E., and their older brother frequently went to Aunt and "Scotty's" house and often spent the night.  Aunt had a pool in the backyard and a pool table, and all the cousins would have fun hanging out and building forts in the living room.  J. would typically sleep on the couch in the living room or in her cousins' bedroom.

  J. testified that Havellana always treated her with "slight favoritism"—letting her have extra snacks, stay up late, or watch a movie that she "wasn't necessarily allowed to watch."  She testified she knew he favored her because "[she] was his little slave," "sexually speaking" because she "performed the acts that he wanted [her] to do."

  J. testified Havellana started touching her inappropriately when she was five years old.  He would touch her vagina with his hands when she was in the bathtub.  She said "he never like fully penetrated [her] during that period," but "it was . . . weird," and it was not how her mother or father would wash her in the bath, and even at age five, she felt that it "wasn't normal." The inappropriate behavior continued until she was somewhere around 10 years old, when she started going through puberty.  J. testified it happened every time she went to his home for a sleepover.

  When J. was six or seven, Havellana would put his penis to her vagina. Sometimes it would happen in her cousins' room and sometimes he would carry her from her cousins' room to another place—his room, the living room, the garage (which had a bedroom built in), or the pool table.  Most of the time it happened in the living room or his bedroom.  He would position her body in

5

different positions: sometimes "laying on [her] stomach towards the edge of the bed," or "on [her] back," or "on [her] side." He would "just rub [his penis] around, like he would with his hands, like on the outside. And then there was a couple of times where he would like try to put it in." She said she could feel pain when he tried to do this. He would rub his penis inside of the labia and touch her clitoris with his penis.

J. specifically recalled one incident when she was in her cousin's bed, lying on her stomach and he was behind her, and he ejaculated on her back. She testified at that time she "had no idea what it was."

J. specifically recalled another incident when Havellana "had [her] put [her] hand on his penis and move it up and down and then he ejaculated." She testified he put his hand on top of hers and "kind of direct[ed] [her] as to what [she] needed to do."

J. testified Havellana also "would just push [her] head down to [his penis] and . . . just put [her] mouth on it." This happened "more than one time" and occurred when she was seven or eight years old. He also put his mouth on her vagina.

J. testified the abuse occurred in a progression: first, Havellana put his fingers on her vagina in the bathtub, later he "put[] [her] vagina to his mouth," and then he put his penis to her vagina. She also frequently observed him touching his penis with his hand.

J. recalled watching a video in second or third grade about sexual assault, and she realized that was her "normalcy" and her "everyday life."

J. recalled one night, Havellana came into her cousins' room but did not pick her up; instead he picked up her sister E. She testified, "I watched Scotty grab her, and I knew it happened to me, so I knew it was going to happen to her." She did not talk about it with E. at the time.

6

J. testified Havellana never discussed the behavior with her, never told her not to tell anybody or threatened her in any way. She did not want anyone to know what happened and wanted to "deal with it [her]self." But on one occasion when E. told her she was going through something J. did not understand, J. told E., "You know, it happened to me too, so I do understand, I do, I get it."

J. testified that her cousin A. also molested her beginning when she was eight years old. She admitted previously telling A., " 'You robbed me of my youth and my innocence.' " J. testified she was "a thousand percent" confident that the incidents she testified about in this case were things that "Uncle Scotty did to [her]."

### 4. *Stipulated Evidence*

Two stipulations were entered as evidence: first, Mother committed two separate petty theft offenses in 2016 and 2017; and second, A. was "held accountable" for his conduct with J. and E. in another court proceeding in 2018 and 2019.

### 5. *Detective Nevares*

Detective Nevares of the Oceanside Police Department's family protection unit testified he observed the forensic interviews of J. and E., which were conducted in January 2018. He also testified that he and his colleague Detective Baird interviewed Havellana in April 2018. A videotape of the interview was played for the jury.[2] In the interview, Havellana initially denied but then admitted having inappropriate contact with the

---

[2] The interview played for the jury was edited, with certain portions redacted pursuant to an order of the trial court, as discussed more fully in Discussion section I.A. *post*. Detective Nevares also testified that, when Havellana was arrested, his driver's license was impounded; his license indicated that he was born in 1973.

girls. He said it happened "less than 10 times," and stated the first time it happened, he and J. were watching DVD's and there was "just spooning" and "just some rubbing." He admitted rubbing her "butt" but denied rubbing her breasts or vagina. She was "less than [10 years old]" at the time.

He stated he gave all his children baths "the same way" with "a scrunchie and they're all tickled."

Havellana admitted to "rubbing" and "grinding" with E., stating there was "[r]ubbing with my, uh, well, uh, my private, of course." He stated he "just kind of touched her, but never-never in the private part. Maybe on the butt-butt-buttocks." He stated he never did anything other than grind up against E. and stated it happened "so long ago" and he "wasn't a monster." He denied any penetration.

He stated the behavior happened "more with [J.]," and described one time when his towel "fell off" and she was "curious" and "just stroked [his penis] for a little [while]." He stated he did not "actually ejaculate" because they were "distracted" or "interrupted," which he said happened "[a] lot of times . . . ." He admitted "rub[bing]" J. "skin-to-skin" but denied putting his fingers inside her and said he "never penetrated."

He said E. never put her mouth on his penis, but he admitted he touched E.'s "private, her vagina, skin-to-skin," "like once or something."

Havellana admitted he kissed J.'s "butt," and said, "I've done like where I took some spit and just rubbed it [¶] . . . [¶] on my finger" and rubbed her anus and her vagina, but he denied putting his fingers inside her anus and denied putting his mouth on her vagina. He admitted he rubbed his penis on the outside of her vagina, touched her vagina with "a finger," and put his penis in J.'s mouth "a couple times," but also said it was just "one incident."

8

Detective Nevares asked Havellana if he was masturbating when he touched the girls, and Havellana said, "Yeah, well, I was hard and I mean, just aroused, of course." He said, "yeah, and then—you know, some kind of distraction would come up or something, and I'll just finish it off with a porn or something."

Havellana said this conduct occurred over the span of "a couple years" and reiterated it occurred more with J.

Havellana told detectives he once saw his stepson A. "doing something weird" with J. She had her pants down and was bent over, and A. was pulling up his pants. Havellana asked them what was going on but claimed he did not know what A. was doing.

Detective Nevares told Havellana he appreciated him talking to them and said he hoped Havellana felt better "getting it out." Havellana told him he "always felt horrible [¶] . . . [¶] because there was always a devil on one shoulder . . . ." He said if J. and E. were there right now, he would apologize.

Havellana wrote an apology letter to the girls, which was shared with the jury. In the letter, Havellana said: "Hey girls, I just want the two of you to know how sorry your uncle is. I know that we had many good times together like uncles and nieces should. I hope that we can ease all of the bad things that has happened in the past, or at least put it behind us. I just want the two of you to know I suffer every day for the bad things that I have done to the both of you, and I'll always feel sorry for the horrible things that I've done. The two of you got bright futures ahead of you because both of you are beautiful and smart."

6. *Dr. Jones*

Doctor Jamie Jones, a clinical psychologist, testified as an expert regarding delayed disclosure by sexually abused children. Dr. Jones said she

9

had not met or evaluated any of the victims in the case and had not been provided discovery materials or other information about the case. She testified that delayed disclosure occurs when children who are assaulted do not immediately disclose what happened, and if they disclose at all, tend to do so years after the incident. Young children often do not understand what happened, so do not know what to report, and are raised to do what adults tell them to do. Because most child abuse happens in secret, it is an "unspoken message to the child that you're not supposed to talk about it; if it was something to talk about, it would happen in front of everybody."

Dr. Jones testified that, when children are abused by someone they know, positive relationship factors prevent them from disclosing abuse. Children "have a wonderful ability to separate good from bad" and usually focus on the positive experiences rather than the negative ones. Children may also feel guilt or complicity in the behavior, which prevents them from disclosing the abuse.

For young children who are frequently abused, it can be difficult for them to later distinguish one event from the next, and they may be unable to accurately identify how many times the abuse happened, or identify details distinguishing one event from another.

### 7. *Havellana*

Havellana testified in his defense. He claimed he was falsely accused of molesting his nieces "because of what [A.] did to them" and "because [he] didn't stop [A.]" He acknowledged that, in the videotaped interview, he admitted to "spoon[ing]" and "grind[ing]" on the girls, but he claimed he did not do those things. He said he "was making up lies."

Havellana stated that, on the morning of the interview, his roommate told him the police were there, and he became nervous. He went into his

10

backyard "and smoked some marijuana" to calm down, but smoking marijuana made it "hard to hold a conversation."

Havellana claimed he was completely unaware police wanted to talk to him about J. and E.'s allegations, and when he heard the allegations, he thought of a time he caught A. and J. inside the garage bedroom, when A. "was behind her mounted to her." He testified that, in retrospect, he should have told J.'s father about the incident, but he did not tell anyone about the incident because he was protecting his son. He testified that the apology letter he wrote had nothing to do with his own actions, but rather was about not stopping A.'s behavior.

### 8. *Closing Arguments*

The prosecutor argued that the girls' testimony and Havellana's own statements to the police collectively demonstrated he was guilty on all charged counts. Defense counsel argued it was not plausible that Havellana could have abused the girls in secrecy for so long in the family's small, crowded house, and further argued the girls' accounts of the abuse were not credible. Defense counsel argued that Havellana falsely confessed to protect his son.

### C. *Verdict and Sentencing*

The jury delivered guilty verdicts on all counts and found true all allegations. The trial court sentenced Havellana to a total term of 195 years to life in prison.

## DISCUSSION

### I.

*Motion to Suppress Statements to Police*

A. *Additional Background*

As previously noted, Detectives Nevares and Baird interviewed Havellana after he was arrested and transported to the Oceanside Police Department. At the outset of the interview, detectives asked Havellana for his full name, birthdate, and address. After they chatted briefly, Detective Nevares read Havellana his rights:

> "[Detective] Nevares: . . . Prior to us, even talking about anything [¶] . . . [¶] . . . I got to, administratively, I've got to tell you this. You, you have the right to remain silent. Um, any statements you make may be used against you. You have the right to the presence of an attorney, either retained or appointed free of charge before and during any questioning. Do you understand these due rights?

> "Havellana: Uh, sure, yeah. Can you repeat it again?

> "[Detective] Nevares: You have the right to remain silent [¶] . . . [¶] [a]nd you have the right to the presence of an attorney.

> "Havellana: Okay.

> "[Detective] Nevares: Okay? So I—I need to hear a yes. Do you understand those rights?

> "Havellana: Yes, yes."

After this admonition, detectives told Havellana that "being a good dad" and "paying for child support and all that other stuff . . . tells a lot about [his] character." Detective Baird told Havellana he wanted to discuss why Havellana was "here" (at the police station) and asked Havellana if he wanted to talk to police about it. Havellana responded, "Yeah, sure . . . ."

The detectives informed Havellana his nieces had reported he sexually molested them in his house and garage at night. Havellana denied touching the girls in a sexual manner and claimed he was "stunned" and "baffled."

Detectives told Havellana, "obviously [he was] under arrest" and "with absolute certainty [they knew] that something happened," but they wanted to give him an opportunity "to explain things . . . from [his] perspective." Detective Baird asked, "[W]as it like every day, 100 times, all the time, like they're trying to say? Or was it more like a couple incidental interactions?" Havellana stated that "if anything it was just like minor." Detective Baird then compared Havellana's position to being in "a train at the top of a hill":

> "[Detective] Baird: . . . [W]hat I want you to imagine right now is . . . you're in a train at the top of a hill. You're under arrest, so that train is going down that hill. And it's picking up speed as it gets closer and closer to the bottom. We've already done—my partner [Nevares] here has done a very thorough investigation, and like I said, the reason you're under arrest and this isn't a hey, you're free to go at the end of this type of conversation, is because of this thorough investigation. All that investigating really put a lot of speed into that train going to the bottom of the hill, and now we've at least gotten you to the point where you're opening up a little bit, and what I want you to realize, when that train gets to the bottom of the hill, if you throw some brakes on it, if you tell us everything that really happened, it can slow down, you can safely make that turn and move on with life. But if you hold onto some truths, or you're not forthcoming about everything, that train is going to crash, and this is going to be part of your future instead of part of your past. If you tell us everything right now— because we're already here, you're already under arrest. The gig's up. Everything moves into your past, and you move forward. You know what? Shit happened, it was minor, like you said, it wasn't anything crazy, but it's now in our past and you can move forward and never have to think about it again, just look, I made a mistake, it was stupid, and I don't have to think about it ever again. But

when you don't say everything and when you hold things back, that is when it becomes part of your future, because more information comes out, and then you get rearrested for new charges. Then you get, you know, put through the system a second time, and you have to keep going through the ringer because instead of it being the past and you just tell us what's up and paint the real picture, it's going to be part of your future, and it's something you're always going to have to sweat, and we don't want you to have to do that. And so you were saying that it was just—it was minor, but would—would you say it was in excess of like 100 times, or would you say it was 10 or less than that?

"Havellana: I'd say it was like less than 10 times.

"[Detective] Nevares: . . . That's what we figured . . . . [T]o be honest with you, these . . . girls want to move past everything, too. . . . [T]hey don't want anything to do with it, you know? And I'm just trying to button up some stuff. That's why we . . . didn't take you in a patrol car, right? This isn't like a formal [¶] . . . [¶] crazy, crazy thing, you know what I'm saying? You know . . . we don't go after people in . . . suits, right? We go out for them in uniforms and in patrol cars, right? And so I'm just trying to close some loose ends, get . . . these girls some closure so that we're done, and you'll never have to see me again, I'll never have to see you again, but I need to . . . finish out this report and get this thing taken care of. You understand what I'm saying? And so [¶] . . . [¶] that's why I appreciate you being honest with us, you know, because all I want to do is make sure that it's documented[,] what happened, and it doesn't happen ever again. You understand me?

"Havellena: . . . I totally understand you, sir.

"[Detective] Nevares: So tell me what happened?"

Havellana then proceeded to make the admissions discussed *ante* in Facts, Section B.5.

Defense counsel moved in limine to exclude Havellana's statements to the police. As relevant to the issues on appeal, Havellana argued that (1) the

14

questions regarding his birthdate and address were incriminating and made before detectives administered an admonition under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), (2) Havellana did not understand or intelligently waive his *Miranda* rights, and (3) his incriminating statements were involuntary "due to the deception, leniency and threats" of the detectives and due to the detective's "impermissibl[e] attempt[] to soften Mr. Havellana up by complimenting . . . his character."[3]

The prosecutor countered that, in the interview, Havellana expressed he understood his rights and then spoke freely with officers about the charged incident. Even if some of the officers' statements were misleading, they were not impermissible because they were not coercive and not reasonably likely to produce an untrue statement, and the officers' urging Havellana to tell the truth did not make the confession involuntary.

The trial court ruled (1) the statements made prior to the *Miranda* admonition were not incriminating, with the exception of Havellana's birthdate and address, which the court ordered to be stricken; (2) the pre-*Miranda* statements made by the officers were not improper softening up; (3) the *Miranda* admonition was sufficient and Havellana waived his rights; and (4) during the course of the interview, Havellana was not improperly

---

[3] Havellana also argued the interrogation used an improper "two-step" interrogation tactic under *Missouri v. Seibert* (2004) 542 U.S. 600, 620-621, but he does not reassert that argument on appeal.

threatened, coerced, or told he would receive leniency, such as to render his statements involuntary.[4]

Havellana now contends his pretrial suppression motion was erroneously denied, his statements to detectives should have been excluded at trial, and the error was prejudicial. He contends the record does not support the conclusion his statements were made after a knowing, intelligent waiver of his *Miranda* rights or that his statements were voluntarily given.

B. *Applicable Law*

The Fifth Amendment guarantees that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) In *Miranda*, the United States Supreme Court held that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." (*Miranda*, *supra*, 384 U.S. at p. 467.) A person questioned by law enforcement after being "taken into custody" must first be warned that he or she has the right to remain silent, that any statements that he or she makes may be used

---

[4]    With respect to the detective's train analogy, the trial court remarked, "While I may not be enamored with the manner in which they did it, I don't find the nature of those statements are sufficient to have so overridden the defendant's willingness or opportunity to talk that he was either doing so because he was coerced or doing so because he thought something more lenient would happen."

against the person, and that he or she has a right to the presence of an attorney, either retained or appointed. (*Id*. at p. 444.)

" 'To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation.' " (*People v. Duff* (2014) 58 Cal.4th 527, 551 (*Duff*).)

In addition, "[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial." (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).) "As with *Miranda* waivers, the People bear the burden of establishing by a preponderance of the evidence the voluntariness of a confession." (*Duff, supra*, 58 Cal.4th at p. 551.)

"In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' [Citations.] Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*Duff, supra*, 58 Cal.4th at p. 551.)

C. *Analysis*

The parties do not dispute that Havellana was interrogated by police detectives while in custody after his arrest and *Miranda* therefore applies. (*Miranda, supra*, 384 U.S. at p. 478 [for the *Miranda* rule to apply, there

17

must be an interrogation by a police officer (or the officer's agent) while the suspect is in police custody].)

The record supports the trial court's determination that Havellana's waiver of his *Miranda* rights was " 'knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation.' " (*Duff, supra,* 58 Cal.4th at p. 551.) After brief, introductory questions, police detectives advised Havellana he had the right to remain silent, that any statements he made may be used against him, and that he had a right to counsel, either retained or appointed free of charge, during any questioning. (See *Miranda, supra,* 384 U.S. at p. 444.) When asked if he understood these rights, Havellana replied, "[Y]eah," and then asked, "Can you repeat it again?" After the detective reiterated he had the right to remain silent and the right to the presence of an attorney, Havellana stated, "Okay," and when directly asked if he understood his rights, responded, "Yes, yes." The record demonstrates Havellana adequately understood his rights. He expressed understanding before asking for the statement to be repeated, and then reiterated his understanding. He requested no additional information and did not express any confusion regarding his rights.[5] Although he did not expressly articulate

---

[5] In a footnote in his opening brief, Havellana mentions his use of marijuana prior to making his statements. Havellana did not argue his marijuana use rendered his confession involuntary in the trial court, and does not develop this argument on appeal. It is therefore forfeited. (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 ["unless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal, even if the defendant asserted other arguments under the same decision"]; *People v. Koenig* (2020) 58 Cal.App.5th 771, 796, fn. 30 [arguments raised in a footnote on appeal are forfeited]; see also *People v. Jackson* (1989) 49 Cal.3d 1170, 1189 [a defendant's voluntary ingestion of alcohol or drugs alone does not establish a lack of capacity to waive *Miranda* rights].)

his desire to waive his rights, he willingly talked and continued answering detectives' questions during the interview. When asked directly if he wanted to discuss why he was arrested and in custody, Havellana responded affirmatively. At no point during this interview did Havellana ask to stop talking, invoke his right to an attorney, or express an unwillingness to continue answering questions. "Law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview. [Citation.] Rather, a valid waiver of *Miranda* rights may, as here, be inferred from the defendant's words and actions." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642 (*Cunningham*).) Havellana's statements and actions here—including his willingness to answer the detectives' questions, after being advised of and stating he understood his rights—establish an implied waiver of his *Miranda* rights. (*Ibid.*; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1269 ["Here, the videotape provides substantial evidence supporting the trial court's finding of an implied waiver. The court's ruling was also legally correct."].)

Havellana alternatively argues his statements were involuntary in light of a combination of factors, including the detectives' alleged improper " 'softening up,' " use of deception, and what Havellana contends were "deceptive inferences of leniency" amounting to an implied promise of favorable treatment.

"The test for the voluntariness of a custodial statement is whether the statement is ' "the product of an essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion." (*Cunningham*, *supra*, 61 Cal.4th at p. 642.) "Relevant considerations include ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its

location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*Id*. at pp. 642-643.)

The record here establishes that Havellana's will was not overborne and his statements were not coerced. Relying primarily on *People v. Honeycutt* (1977) 20 Cal.3d 150, Havellana contends the detectives employed improper " 'softening up' " tactics because, at the outset of the interview, they told him he was a good dad with good character because he provided financial support to his ex-wife for the children. In *Honeycutt*, the detectives engaged in a good cop/bad cop or "Mutt and Jeff" routine, "where one officer acts aggressively and hostile while a second officer, when alone with the suspect, seeks to gain his confidence by disapproving his partner's behavior." (*Id*. at p. 160, fn. 5.) The defendant was initially hostile to one detective, calling him racial epithets and spitting on him. (*Id*. at p. 158.) After that detective left, another detective, who had known the defendant for about 10 years, had a 30-minute unrecorded discussion with the defendant—without administering *Miranda* warnings. (*Ibid*.) They discussed past events and former acquaintances, and the detective made disparaging comments about the victim. (*Id*. at pp. 158-161.) The *Honeycutt* court found the use of these coercive strategies before a *Miranda* advisement rendered the subsequent waiver involuntary, stating that "[w]hen the waiver results from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary." (*Id*. at p. 160.)

Havellana's reliance on *Honeycutt* is misplaced, as the decision "has been limited to its facts" by our Supreme Court. (*People v. Krebs* (2019) 8 Cal.5th 265, 306.) "That holding finds no application in this case:

[detectives] did not disparage the victims, engage in conversations that could be fairly characterized as 'ingratiating,' or fail to give defendant *Miranda* warnings before he confessed." (*Ibid*.; see also *People v. Molano* (2019) 7 Cal.5th 620, 661-662 [rejecting defendant's claim that detectives used improper softening up tactics during transportation of arrestee from state prison to local facility, despite their disparagement of the victim and appealing to defendant's desire to mend his relationship with his children]; *People v. Gurule* (2002) 28 Cal.4th 557, 602 [declining to apply *Honeycutt* when there was no evidence "that the manner in which [the police] engaged in small talk overbore defendant's free will"]; *People v. Kelly* (1990) 51 Cal.3d 931, 954 [finding *Honeycutt* "clearly distinguishable" when "[n]o misconduct of [the type described in *Honeycutt*] occurred here"].) Havellana was not initially hostile with the detectives or unwilling to talk, and the detectives did not have or exploit a prior relationship with him. No improper softening up occurred when the detectives—in a recorded conversation—briefly engaged in small talk regarding his character and provision of financial support to his family. The detectives' actions, apparently designed to build rapport with Havellana, were not impermissible. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1081, 1086-1087 [asking about the suspect's "upbringing, his decision to join the Navy, and his hobbies" was held to be permissible "to establish a rapport"]; *People v. Williams* (2010) 49 Cal.4th 405, 447 (*Williams*) ["Nor is it inherently coercive for an interrogator to attempt to form a rapport with the suspect."].)

Havellana also contends that detectives improperly used deception during the interrogation by suggesting they had not previously spoken to his ex-wife and stating that " '[t]his isn't formal.' " "In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological

21

ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' " (*People v. Smith* (2007) 40 Cal.4th 483, 501 (*Smith*).) Here, the detectives stated that the situation was not "like a formal [¶] . . . [¶] crazy thing" where the police "go after" a suspect "in uniforms and in patrol cars."[6] But by this point, Havellana had already been told he was under arrest, and he had already begun to make damaging statements—albeit in a manner that attempted to minimize his conduct. Even if the reference to the situation not being "formal" at this stage was ambiguous, the circumstances Havellana emphasizes do not amount to coercion which renders his statements involuntary. (See *People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280 [subterfuge is not necessarily impermissible and is not the same as coercive conduct].) Similarly, any failure by the detectives to acknowledge they had talked to Havellana's ex-wife, who worked in an administrative role at the police station, was inconsequential and Havellana does not explain the purported significance of it.[7] Any deception in this regard was not likely to produce a false confession. (*Williams*, *supra*, 49 Cal.4th at p. 443 [deception may not be of the type reasonably likely to produce an untrue statement].) Finally, the detectives' suggestion that they were awaiting results from "the lab" does not assist Havellana. During the interrogation, detectives twice

---

[6]     The detectives interrogating Havellana were not in uniform.

[7]     Havellana states in his opening brief that the detectives "pretended not to know appellant's ex-wife, who worked at their police station," but he does not provide a record citation establishing that the detectives did in fact know her. More importantly, Havellana never explains why this fact is material even assuming it is true—not in his opening brief and not in his reply brief, even after the People pointed out that any evasiveness regarding the ex-wife was immaterial.

made vague reference to receiving "a call . . . from the lab" earlier that morning. At trial, Detective Nevares acknowledged there was no physical evidence and the references to the lab were "a ruse." These statements were not coercive and did not render Havellana's *Miranda* waiver involuntary. (*People v. Farnam* (2002) 28 Cal.4th 107, 182 [false statements by police that defendant's fingerprints had been found on victim's wallet did not render defendant's confession involuntary]; *Smith*, *supra*, 40 Cal.4th at p. 505 [false statement by detectives that a gunshot residue test showed that the defendant had fired a gun recently was not so coercive as to produce an involuntary or unreliable statement].)

Havellana's contention that the detective's train analogy amounted to an implied promise of leniency, rendering his statements inadmissible, also is unpersuasive. " '[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.' [Citation] An improper promise 'must be causally linked' to the defendant's confession to warrant exclusion under the Fifth Amendment." (*People v. Wall* (2017) 3 Cal.5th 1048, 1066.) "The requisite causal connection between promise and confession must be more than 'but for': causation-in-fact is insufficient." (*People v. Benson* (1990) 52 Cal.3d 754, 778.) As set forth *ante*, the detectives stated Havellana was under arrest, so the "train" he was in was going down a hill and picking up speed, and if he "[told officers] everything that really happened" he could "turn [the corner]" and "move on with life," but if he was not forthcoming, he may be subject to rearrest for future charges. There were no promises of leniency, express or implied, that rendered his subsequent admissions and confession involuntary and inadmissible. The detectives did not state or

suggest that he would receive leniency or favorable treatment. On the contrary, the detectives emphasized Havellana was "already under arrest" and would not be "free to go" at the end of the conversation and stated, "[t]he gig [is] up." Our Supreme Court has "made clear that investigating officers are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime." (*People v. Ray* (1996) 13 Cal.4th 313, 340.) "[M]erely advising a suspect that it would be better to tell the truth, when unaccompanied by either a threat or a promise, does not render a confession involuntary." (*People v. Davis* (2009) 46 Cal.4th 539, 600; see *Linton*, *supra*, 56 Cal.4th at p. 1178 ["There was nothing coercive in the officers urging defendant to tell the truth and informing defendant of the obvious point that the sooner he told the truth, the sooner the interview would finish."].)

Havellana's reliance on *People v. Cahill* (1994) 22 Cal.App.4th 296 (*Cahill*) is misplaced. In *Cahill*, the interrogating officer provided the defendant a detailed, "materially deceptive" account of the law of murder and suggested the defendant could avoid a charge of first degree homicide if he admitted to his role in the killing. (*Id.* at p. 315; see also *id.* at p. 314 ["[t]he clear implication of [officers'] remarks [was] that defendant would be tried for first degree murder *unless* he admitted that he was inside the house and denied that he had premeditated the killing"].)[8] Unlike *Cahill*, the detectives here were not impermissibly implying that Havellana would receive lenient treatment in exchange for a confession. Nor were the statements threatening or intimidating. (See *People v. Holloway* (2004) 33 Cal.4th 96, 117 ["suggesting that defendant might benefit in an unspecified manner" was not

---

8       The detectives omitted reference to the felony-murder doctrine. (*Cahill*, *supra*, 22 Cal.App.4th at p. 315.)

improper]; *People v. Spears* (1991) 228 Cal.App.3d 1, 27 [a detective's post-*Miranda* comments to a defendant that it was " 'time [he] got this off [his] chest' " was not improper].)

Havellana additionally argues he had no experience with law enforcement interrogation and may not have "understood the implications of the officers' questioning." The record does not support the contention that he did not understand the situation and interrogation. As discussed, the detectives provided complete and accurate *Miranda* warnings, and Havellana expressed his understanding through his words and actions. "[T]he fact that he lacked experience with the criminal justice system did not invalidate his waiver or render his subsequent statements involuntary in the circumstances here." (*People v. Suarez* (2020) 10 Cal.5th 116, 161.)

In sum, based on the totality of the circumstances, we conclude Havellana knowingly and voluntarily waived his *Miranda* rights, and his statements to the police were voluntary and not the result of coercion, deception, or promises of leniency.

## II.

### *Sufficiency of the Evidence Claim*

Havellana contends his convictions in counts 1 through 3 for sodomy by a person over the age of 18 with a child 10 years of age or younger (§ 288.7, subd. (a)) must be reversed for insufficient evidence. Havellana claims E.'s "generic, conclusory description was insufficient to prove the element of penetration beyond a reasonable doubt." We disagree.

Havellana was charged with three separate counts of sodomy with E.: first time in the living room (count 1), last time in the living room (count 2), and one time in Havellana's bedroom (which he shared with Aunt) (count 3). On those counts, the jury was instructed that the prosecution was required to

25

prove that E. was 10 years of age or younger, that Havellana was over 18, and Havellana engaged in an act of sodomy, which is "any penetration, no matter how slight, of the anus of one person by the penis of another person. Ejaculation is not required."  (CALCRIM No. 1127.)[9]

In response to Havellana's challenge to the sufficiency of the evidence supporting his conviction, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  We must "determine whether [the record] discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  The standard of review is the same in cases in which the People rely mainly on circumstantial evidence.  [Citation.]  'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the

_____

[9]     After the jury retired to deliberate, they sent a note, asking, "Definition of [s]odomy requires penetration.  If the victim's orifice is too small for 'success,' does 'thrusting' constitute penetration?  Is contact enough for slight penetration?"  In response, the trial court instructed the jury: "Sodomy requires something more than penetration of the buttocks, but does not require penetration past the anal verge or into the anal canal.  Sexual penetration requires penetration of the tissues that surround and encompass the lower border of the anal canal—that is, it requires penetration past the buttocks and into the perianal area but does not require penetration beyond the perianal folds or anal margin.  Mere penetration of the buttocks is not sufficient to establish penetration of the anal opening.  'An intrusion into the space between a person's buttocks, while perhaps a necessary step on the path to intrusion of the anal opening, is not, in itself, an intrusion into the anal opening.' "  Havellana does not contend the jury was erroneously instructed.

other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)

Evidence supports the jury determination that Havellana sodomized E. on (at least) the three charged occasions. Fifteen-year-old E. testified Havellana would wake her while she was sleeping on the couch, "flip[]" her onto her stomach, and "kind of like hover[]" over her so that she could not get up. She testified that sometimes he would put his penis "*on* [her] butt" and other times he would put it "*in*" (italics added). E. stated that, when she said he put his penis "in [her] butt," she meant "the anus in [her] bottom." She described having pain in her anus afterward. She testified this happened "a lot" when she slept on the couch in the living room, but also at least once when she was sleeping in Aunt's bedroom—"he put his penis in [her] anus." E. testified the sodomy occurred consistently from when she was age seven to 10 years old.

Contrary to Havellana's argument, E.'s testimony is sufficient to establish he sodomized her on (at least) three occasions. (*People v. Paz* (2017) 10 Cal.App.5th 1023, 1040 (*Paz*) [testimony of a single witness may be substantial evidence to support a verdict].) Sodomy is " 'sexual conduct consisting of contact between the penis of one person and the anus of another person' " where " '[a]ny *sexual penetration*, however slight, is sufficient.' " (*Id.* at p. 1030, quoting § 286, subd. (a) [defining sodomy].) "[S]exual penetration" is " 'the act of causing the penetration, however, slight, of the . . . anal opening.' " (*Paz*, at p. 1033, quoting § 289, subd. (k)(1) [sexual penetration].)

27

The term "anal opening" is broadly defined to include "the perianal folds [that] radiate from the anus [and] comprise the outer boundary of the anus." (*Paz*, at p. 1037.) Thus, while penetration of only the buttocks is insufficient to constitute sodomy, penetration past the buttocks and into the perianal area is all that is required; penetration beyond the perianal folds or anal margin is not required. (*Id.* at pp. 1037-1038 & fn. 13; see *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1366-1371 [addressing sexual penetration of the vagina].) E.'s testimony distinguished between the times Havellana put his penis "on [her] butt" and when he put it "in," and emphasized he put it "in" "the anus in [her] bottom," and this caused her pain "in [her] anus." It happened "a lot" on the couch in the living room and at least once in the bedroom, on a consistent basis when she was between the ages of seven and 10. E.'s testimony thus supports the three separate charges of sodomy: first time in the living room (count 1), last time in the living room (count 2), and in the bedroom (count 3).

Havellana claims E.'s testimony was shaped by the prosecutor's use of the term " 'inside the anus.' " We reject Havellana's suggestion that E.'s testimony regarding penetration was not her own, but rather was influenced by the prosecutor's terminology during questioning. E. was 15 years old at the time of trial. She clearly testified "yes," when asked, "[s]o the opening, the anus in your bottom, is that where he put it?" In *Paz*, the Court of Appeal "caution[ed] prosecutors not to use vague, euphemistic language and to ask follow[-]up questions where necessary." (*Paz*, *supra*, 10 Cal.App.5th at p. 1038.) That is what occurred here. We reject Havellana's claim that the prosecutor influenced E.'s testimony, or that E.'s testimony does not constitute substantial evidence of penetration. We therefore reject

28

Havellana's argument that insufficient evidence supports the three sodomy convictions. (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)

## III.

### *Cruel and Unusual Punishment*

A. *Additional Background*

A probation officer prepared a report in anticipation of sentencing. Using the Static-99R (SARATSO) risk assessment analysis, the probation officer estimated that Havellana's relative risk of reoffending was below average.[10] The probation officer identified one possible circumstance in mitigation, that Havellana had no prior criminal record (Cal. Rules of Court, rule 4.423(b)(1)), and two possible circumstances in aggravation, the manner in which the crimes were carried out indicates planning (*id*., rule 4.421(a)(8)) and the charged counts captured conduct including the first and last occurrences of each specific offense, while the entirety of the conduct occurred more than twice (*id*., rule 4.408(a)). The probation officer recommended imposing a total prison term of 20 years plus 240 years to life.

The prosecution submitted a sentencing statement arguing additional factors in aggravation should be considered by the court: the victims were particularly vulnerable as they were under the age of 10 (Cal. Rules of Court, rule 4.421(a)(3)); the manner in which the crimes were carried out over the span of years indicated some level of grooming, which indicated some planning, sophistication, or professionalism (*id*., rule 4.421(a)(8)); and the defendant took advantage of a position of trust or confidence to commit the offenses, abusing his nieces when they were entrusted to be in his home (*id*., rule 4.421(a)(11)). The prosecution identified a single mitigating factor, that

10     SARATSO stands for state authorized risk assessment tools for sex offenders.

Havellana had no prior criminal record.  (*Id.*, rule 4.423(b)(1).)  The prosecution requested that the court impose a total sentence of 285 years to life in state prison.

At sentencing, Havellana asserted numerous objections, including objections on constitutional due process and cruel and unusual punishment grounds.  The trial court indicated that, based on the forcible sexual offense charges, Havellana was statutorily ineligible for probation (§ 1203.066, subd. (a)(7), (8)), and stated that even if the court had discretion to grant probation, it would decline to do so based on the nature of the offenses.  The trial court further indicated that the forcible sexual offenses by statute were mandatory consecutive (§ 667.6, subds. (d), (e)(5)), and stated that even if the court had discretion to grant concurrent sentences on those offenses, it would decline to do so, based on the factor in aggravation "as it relates to a violation of [a] position of trust."

The trial court sentenced Havellana to consecutive 25-years-to-life terms on counts 1, 2, and 3 (for violations of § 288.7, subd. (a)) (comprising three consecutive 25-years-to-life terms), consecutive 15-years-to-life terms on counts 10-13 (for violations of § 288.7, subd. (b)) and counts 16-19 (for violations of § 288, subd. (a)) (comprising eight consecutive 15-years-to-life terms), and imposed terms on counts 4-9 and 14-15, but stayed them pursuant to section 654, for a total term of 195 years to life in prison.

Havellana now contends his 195-years-to-life sentence constitutes cruel and unusual punishment in violation of both the California and United States Constitutions.  (See U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.)

B. *Analysis*

"Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be

viewed in the light most favorable to the judgment." (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82.)

The Eighth Amendment of the United States Constitution forbids only sentences that are "grossly disproportionate" to the crime. (*Ewing v. California* (2003) 538 U.S. 11, 20 (*Ewing*).) This proportionality principle is narrow when applied in noncapital cases.[11] (*Ibid.*) Under the California Constitution, a punishment is cruel or unusual "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424; see *People v. Wilson* (2020) 56 Cal.App.5th 128, 167 (*Wilson*).)

"*Lynch* describes three 'techniques' to determine whether a sentence is so disproportionate to the crime as to constitute cruel or unusual punishment. [Citation.] We first consider 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' [Citation.] Next, we compare the sentence to 'punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious.' [Citation.] Finally, we compare the sentence 'with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision.' [Citation.] The weight afforded to each prong may vary by case. [Citation.] 'Disproportionality need not be established in all three areas.' " (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).)

---

11    We reject Havellana's contention his sentence should be analyzed under *Coker v. Georgia* (1977) 433 U.S. 584. As that case concerns disproportionality of a sentence of death for the crime of rape of an adult woman, it is inapt here.

Here, the nature of the offenses—sexual offenses committed against young children—is of considerable seriousness. California courts have long recognized "a strong public policy to protect children of tender years." (*People v. Olsen* (1984) 36 Cal.3d 638, 646.) "Along a spectrum ranging from murder, mayhem, and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.'" (*Baker, supra,* 20 Cal.App.5th at pp. 724-725.)

Havellana acknowledges the crimes in this case "were no doubt serious," but contends they are not as serious as first degree murder, which he observes carries a sentence of "only 25 years to life."[12] Havellana contends the sentence imposed serves no legitimate penal purpose and is disproportionate to the crimes committed. Citing *Ewing, supra,* 538 U.S. at pages 29-30, he argues that "life sentences of this sort are primarily intended to target those who have not only displayed much more egregious forms of criminal behavior but who have also shown a clear unwillingness to conform to society's norms by pursuing a life of crime despite repeated criminal sanctions."[13] Havellana neglects, however, that he was convicted and sentenced not for a single offense, but for three separate counts of sodomy of a child aged 10 or younger, four separate counts of oral copulation with a child aged 10 or younger, and four separate counts of committing a lewd act

[12] Havellana argues, he "could have killed someone and received a lesser, or the same sentence," and he "could have raped someone with force and received a lesser, or the same sentence."

[13] In *Ewing*, the Supreme Court found defendant's sentence of 25 years to life in prison imposed for the offense of felony grand theft under California's "Three Strikes" law was not grossly disproportionate and did not violate the Eighth Amendment's prohibition on cruel and unusual punishments. (*Ewing, supra,* 538 U.S. at pp. 30-31.)

on a child under the age of 14.  (He was also convicted on six additional charges of committing a lewd act or a forcible act on a child and two additional charges of attempted sexual intercourse with a child aged 10 or younger, but the trial court stayed imposition of sentences on those crimes.)  The convictions demonstrate that Havellana repeatedly committed severe and numerous sexual offenses on multiple vulnerable victims, over the course of several years, while the vulnerable victims were entrusted in his care.  Courts have upheld similar sentences under similar circumstances.  (*People v. Andrade* (2015) 238 Cal.App.4th 1274, 1309-1310 [upholding sentence of 195 years to life comprised of 13 consecutive terms of 15 years to life, for sex crimes against five victims]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531-532 [upholding sentence of 129 years for 25 sex crimes against a single victim]; *Wilson*, *supra*, 56 Cal.App.5th at pp. 140, 170 [upholding sentence of 45 years to life for four sex offense counts against two victims]; see also *Baker*, *supra*, 20 Cal.App.5th at pp. 722-733 [upholding sentence of 15 years to life for single count of oral copulation with a child 10 years or younger against a single victim].)

Moreover, as this court noted in *Baker*, many states other than California impose harsh penalties, including life in prison, for sexual offenses committed against children.  (*Baker*, *supra*, 20 Cal.App.5th at pp. 730-731.)  We are therefore not persuaded by Havellana's contentions regarding the disproportionality of the sentence imposed.

Havellana further contends the trial court abused its discretion when it "[ran] multiple counts consecutive to each other to impose a sentence equivalent to several life times, where the court had discretion to do otherwise, based upon the one aggravating factor for a defendant who had no prior criminal history, had lower than average risk of re-offending, had no

33

evidence of committing any offenses in the past five years, and exhibited no behavior reflecting he is a danger to society in general." Havellana does not dispute that the trial court had authority to impose consecutive terms for the counts but contends its decision to do so "exceeds the bounds of reason."

We review a trial court's sentencing decision for abuse of discretion. (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.) We find no abuse of discretion on this record.[14] We have already rejected Havellana's constitutional challenge to the sentence and likewise reject his contention that the sentence imposed "exceeds the bounds of reason." As noted, many states impose indeterminate life sentences for crimes of sexual abuse of a child. Havellana was convicted of committing 19 separate sexual offenses against two child victims. Havellana continues to misplace his focus on factors favorable to him without recognizing the severity and numerosity of the crimes committed. He incorrectly claims only one aggravating factor was applicable here, acknowledging only the violation of a position of trust (Cal. Rules of Court, rule 4.421(a)(11)), and focuses on circumstances in mitigation (including his lack of prior criminal history). But the record indicates at least three aggravating factors were present here: the victims were particularly vulnerable as they were under the age of 10 (Cal. Rules of Court, rule 4.421(a)(3)); the manner in which crimes were carried out, over the span of years, indicated some level of grooming, which indicated some planning,

---

14      Because we conclude Havellana has not established a constitutional violation, we decline to consider the Attorney General's additional argument that, under *People v. Franklin* (2016) 63 Cal.4th 261, 278, the elderly parole provision set forth in section 3055 " 'supersede[s] the statutorily mandated' sentence." As such, we deny Havellana's request for judicial notice of statistics regarding the elderly parole program and life expectancy in California prisons.

sophistication, or professionalism (*id*., rule 4.421(a)(8)); and the defendant took advantage of a position of trust or confidence to commit the offenses, taking advantage of his nieces when they were entrusted to be in his home (*id*., rule 4.421(a)(11)).  Moreover, as the probation officer observed, the charged crimes reflected only a minor fraction of the incidences of sexual assault detailed by the victims in this case.  (*Id*., rule 4.421(a) [listing factors in aggravation relating to the crime], rule 4.408 [listing of factors is not exhaustive or exclusive].)  The trial court expressly referenced "the factor [in] aggravation as it relates to a violation of position of trust" as the "most significant" and additionally referenced "the nature of the particular offenses in this case."  It is clear from the record that the trial court considered the appropriate legal authority and the circumstances of the crimes and thoughtfully exercised its discretion in tailoring the sentence imposed here.

## DISPOSITION

The judgment is affirmed.


GUERRERO, J.

WE CONCUR:



McCONNELL, P. J.



AARON, J.

35